DOCUMENT 2

ELECTRONICALLY FILED
5/28/2021 5:30 PM
03-CV-2021-900573.00
CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA
GINA J. ISHMAN, CLERK

IN THE CIRCUIT COURT
OF MONTGOMERY COUNTY, ALABAMA

FRANKIE HAMMONDS,                        )
                                          )
            Plaintiff,                    )
                                          )
vs.                                       )        Case No.: _____
                                          )
MONTGOMERY CHILDREN'S                     )
SPECIALTY CENTER, LLC, AND                )
FICTITIOUS DEFENDANTS 1 - 60,             )
DESCRIBED BELOW:                          )

Fictitious Defendants 1 - 10 are those persons or entities, whether singular or plural, that abused, mistreated, exploited, or neglected Frankie Hammonds while he was a minor resident patient at MCSC; Fictitious Defendants 11 - 20 are those person or entities, whether singular or plural, who were staff members of MCSC that abused, mistreated, exploited, or neglected Hammonds while he was a minor resident patient at MCSC; Fictitious Defendants 21 - 30 are those persons or entities, whether singular or plural, who retaliated against Hammonds for his complains about his mistreatment, abuse, neglect, or exploitation; Fictitious Defendants 31 - 40 are those entities that own and/or operate and/or staff the MCSC facility; Fictitious Defendants 41 - 50 are those persons, whether singular or plural, responsible for the training and/or supervision of the staff members who neglect, mistreated, abuse, or exploited Hammonds; Fictitious Defendants 51 - 60 are those persons or entities, whether singular or plural, who acted negligently, wantonly, in violation of any state law, common law, federal statutory law, or federal common law, in a manner that caused any harm to Frankie Hammonds.

                                          )
            Defendants.                   )

## COMPLAINT

## INTRODUCTION

1.    The Complaint alleges violations of § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq.*, violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, claims under the Fair Housing Act, and state law claims for abuse, neglect and/or mistreatment.

1

DOCUMENT 2

## STATEMENT OF THE PARTIES

2.    The plaintiff, Frankie Hammonds, is a citizen of Alabama and is over the age of 18.

3.    The defendant, Montgomery Children's Specialty Center, LLC (hereinafter "MCSC") is a foreign corporation incorporated in the state of Missouri and doing business by agent in the state of Alabama.

4.    Fictitious Defendants 1 - 10 are those persons or entities, whether singular or plural, that abused, mistreated, exploited, or neglected Frankie Hammonds while he was a minor resident patient at MCSC.

5.    Fictitious Defendants 11 - 20 are those person or entities, whether singular or plural, who were staff members of MCSC that abused, mistreated, exploited, or neglected Hammonds while he was a minor resident patient at MCSC.

6.    Fictitious Defendants 21 - 30 are those persons or entities, whether singular or plural, who retaliated against Hammonds for his complains about his mistreatment, abuse, neglect, or exploitation.

7.    Fictitious Defendants 31 - 40 are those person or entities, whether singular or plural, that own and/or operate and/or staff the MCSC facility.

8.    Fictitious Defendants 41 - 50 are those persons or entities, whether singular or plural, responsible for the training and/or supervision of the staff members who neglect, mistreated, abuse, or exploited Hammonds.

9.    Fictitious Defendants 51 - 60 are those persons or entities, whether singular or plural, who acted negligently, wantonly, in violation of any state law, common law, federal statutory law, or federal common law, in a manner that caused any harm to Frankie Hammonds.

## STATEMENT OF FACTS

10.    In February 2017, while a minor child, Hammonds was severely injured in an incident that left him with a traumatic brain injury and partially paralyzed. He is confined to a wheelchair, is paraplegic, and has limited use of motor skills and bodily functions. He requires a catheter,

2

must be rolled every two hours to prevent decubitus ulcers, requires adequate nutrition, and requires a humane environment, safe from harm.

11.    As a minor child, Hammonds was placed at the MCSC facility by the Department of Human Resources. He was an involuntarily civilly incapacitated person at the time of his residency at MCSC.

12.    In or around June 2018, DHR removed Hammonds from his home and placed him in at the MSCS facility. While a resident of the facility, Hammonds experienced abuse, neglect, mistreatment, exploitation, and retaliation in violation of his rights under Alabama law, administrative regulations of the Alabama Department of Mental Health, and in violation of his federal statutory rights under the Rehab Act, the ADA, and the FHA.

13.    While a resident of the MSCS facility in Montgomery County, Alabama, Hammonds was subjected to abuse, neglect, mistreatment, exploitation, and retaliation. This includes, but is not limited to, the following:

   a.    He was neglected by staff;

   b.    He was verbally abused by staff;

   c.    Staff was not properly trained;

   d.    The facility was not properly staffed;

   e.    He was exposed to unsafe conditions;

   f.    He was mistreated by staff;

   g.    His personal items were stolen;

   h.    He did not receive his monthly allotment of federal funds;

   i.    He was not turned every two hours to prevent decubitus ulcers;

   j.    He was not properly fed and suffered from mild malnutrition;

   k.    He was not given sleeping medications by 8:00 p.m. as ordered, which prevented him from appearing on time for the first period of public school and he would often arrived at 9:00 a.m. instead of 7:30 a.m.;

   l.    He was not cathed before attending school, meaning that the school nurse would have to cath him upon arrival, which would cause him to miss the morning periods of the

school day;

m.  Staff was not trained in the operation of Hammonds' chair or in the proper transfer of Hammond;

n.  Staff ignored Hammonds;

o.  When staff was not ignoring Hammonds, they were often verbally abusive to Hammonds and other minor children residents of the facility;

p.  Hammonds was retaliated against by facility staff when he complained about his mistreatment or neglect at the facility;

q.  Staff was antagonistic toward Hammonds;

r.  Staff did not properly apply Hammonds' left arm brace;

s.  Staff did not schedule regular therapy for Hammonds;

t.  Staff allowed a decubitus ulcer to form;

u.  Staff sent Hammonds to school with unwashed, dirty hair;

v.  Staff tormented and bullied Hammonds; and

w.  Staff subjected Hammonds to a hostile environment.

14.  On December 19, 2019, Hammonds was admitted to Children's Hospital in Birmingham. His primary diagnosis was a Decubitus ulcer of ischial area, Stage 4, and also with mild, chronic malnutrition.

15.  The severe right ischial ulcer was tracked to the underlying bone with surrounding erythema, granulation tissue, and necrotic tissue. The overall depth and appearance of the wound was concerning to the hospital staff.

16.  Hammonds was scheduled for surgery and received two operations, under anesthesia, for debridement of the Stage IV Decubitus ulcer. The wound care team at Children's Hospital managed the wound with frequent wound vac changes. Hammonds was discharged from Children's Hospital on January 22, 2020.

17.  Hammonds suffers from traumatic brain injury and paraplegia. Part of his treatment and care would be the treatment and care of his traumatic brain injury.

18.     MCSC provides treatment for children suffering mental and physical disabilities. The facility
        is subject to policies and procedures of the Alabama Department of Mental Health
        ("ADMH") that prohibit the abuse, neglect, mistreatment and/or exploitation of residents of
        facilities that treat mental health patients and residents.

19.     ADMH policies prohibit the abuse, neglect, mistreatment or exploitation of a resident patient
        in such a facility as MCSC.

20.     The ADMH policy states, "Any form of client abuse, neglect, exploitation or mistreatment
        will not be tolerated. The DMH/MR will immediately investigate and will provide for
        appropriate legal and administrative actions." (ADMH Policy 19-10; ADMH Policy 70-5;
        ADMH Policy 20-38).

21.     Policy 19-10 is the Abuse, Neglect, Mistreatment, and Exploitation policy applicable to
        group homes and mental health workers. It prohibits mental health facilities and workers
        from abusing, neglecting, mistreating, or exploiting a mental health patient.[1]

22.     Policy 70-5[2] deals with Employee Conduct and Accountability. It prohibits "Client abuse,
        mistreatment, neglect or exploitation."

23.     Hammonds was a minor child resident patient at MCSC. He suffers from traumatic brain
        injury, spinal cord, damage, paraplegia, and limitations in motor skills and bodily functions.
        His physical and mental disabilities render him disabled as that term is used in the Rehab
        Act, the ADA, and the FHA.

24.     It is a violation of ADMH Policy 19-10 to abuse, mistreat or exploit a mental health patient.
        Neglecting, abusing, mistreating or exploitation a resident patient is a violation of the policy.
        Employees and staff at MCSC have no discretion to violate 19-10, 70-5, or 20-38. Their
        duties are purely ministerial in nature and not discretionary. Thus, to the extent that they
        claim any form of immunity, they are not entitled to any such immunity for their abuse,
        exploitation, mistreatment, or neglect of Hammonds.

25.     ADMH Policy 19-25 requires ADMH to report all instance of abuse, neglect, exploitation
        and mistreatment to the Department of Human Resources. The policy states, "In accordance
        with state law, the Department of Mental Health [ ] shall report to the Department of Human
        Resources (DHR) cases of abuse, neglect, or exploitation involving persons receiving
        services in state operated DMH/MR residential facilities (with the exception of psychiatric
        nursing home(s)) when there is reasonable cause to suspect that abuse, neglect or exploitation

---

[1] "Any form of recipient abuse, neglect or mistreatment will not be tolerated."

[2] "II. STANDARDS: ... Unacceptable conduct is defined as, but not limited to, the following: a.
Client abuse, mistreatment, neglect and exploitation."

has occurred."

26.  Upon information and belief, MCSC violated Policy 19-25 and did not report to DHR that Hammonds was complaining of abuse, neglect, mistreatment, and exploitation.

27.  MCSC and staff failed to protect Hammonds from abuse, neglect, mistreatment, and exploitation. MCSC also failed to report, as required by ADMH rules and regulations, the abuse, neglect, mistreatment, and exploitation of a resident patient.

## COUNT I
## § 504 OF THE REHABILITATION ACT OF 1973

28.  The Plaintiff realleges and incorporates by reference each of the above proceeding paragraphs with the same force and effect as fully set out in specific detail herein.

29.  The Rehabilitation Act of 1973 provides a private cause of action prohibiting discrimination against handicapped individuals under any program or activity receiving federal financial assistance.  Rehab. Act 1973, § 504, as amended; 29 U.S.C.A. § 794.

30.  This Count is brought against MCSC as a recipient of federal funds for monetary damages and other relief available under §504.

31.  Hammonds suffers from traumatic brain injury and paraplegia. As a result, he was involuntarily committed by DHR to MCSC. Hammonds' disabilities substantially limit his ability to enjoy major life activities.  He is disabled within the meaning of §504.

32.  MCSC provides residential services to physically and mentally disabled children in need of humane institutional care. MCSC provides services for children with the assistance of state and federal funding. As a recipient of the federal financial assistance, MCSC is subject to the terms of §504 of the Rehabilitation Act of 1973, as amended.

33.  The physical abuse and denial of those rights provided by the laws and constitution of the United States, as well as state rights, suffered by the plaintiff, entitles him to recovery against MCSC under §504.

34.  Hammonds is entitled to all the damages for his State and federal rights pled in this Complaint including, but not limited to, damages for emotional distress.  The United States Supreme Court in Schultz v. Young Men's Christian Associates of the United States, 139 F.3d 286, 291 (1st Cir. 1998), suggested that in a suit under § 504, "damages for emotional distress [might] be justified to punish patent misbehavior or the deliberate infliction of humiliation."

35.  Hammonds was abused, mistreated, neglected, and exploited by staff members at MCSC.

He was subjected to physical abuse, humiliation, deliberate indifference, neglect, exploitation and/or mistreatment. His treatment was degrading, humiliating and shocking to the conscience of members of our society. The staff members at MCSC assigned to protect and care for Hammonds failed in their ministerial duties by failing to protect him from abuse, neglect, mistreatment, and exploitation and by subjecting him to abuse, mistreatment, neglect, and exploitation.

36.    The remedies, procedures and rights set for in Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.) are available to any person aggrieved by any act or failure to act by any recipient of federal assistance or federal provider of such assistance under § 794 of the Rehabilitation Act of 1973.  29 U.S.C. § 794(a)(2).

37.    The United States Supreme Court's decision in Franklin v. Gwinnett County Public Sch., 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), now provides the dispositive analysis for determining what remedies are available under the Rehabilitation Act.  In Franklin, the Supreme Court reaffirmed the longstanding principle that "where legal rights have been invaded, and the federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the law done."  Franklin, 503 U.S. 60, 112 S.Ct. at 1033 (quoting Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946)).

38.    As a proximate result of the department's violation of the requirements of §504, Hammonds suffered injury and harm.

## COUNT II
## NEGLIGENCE/WANTONNESS

39.    The Plaintiff realleges and incorporates by reference each of the above proceeding paragraphs with the same force and effect as fully set out in specific detail herein.

40.    MCSC MCSC's staff was responsible for following the rules, regulations, policies and procedures of ADMH concerning the humane and safe treatment of recipient residents. MCSC's staff negligent and/or wantonly failed to follow the rules, regulations, policies and procedures of ADMH applicable to group home facilities, including but not limited to Policies 19-10, 20-36, and 70-5.

41.    The violation of ADMH's policies and procedures were the direct proximate cause of harm to Hammonds.

42.    It is a violation of policies and procedures for private group homes, operating under ADMH rules and regulations, to physically abuse, neglect, exploit and/or mistreat a patient recipient.

43.    It is a violation of policies and procedures of ADMH to fail to report physical abuse, neglect,

7

exploitation and/or mistreatment of a recipient patient to the Alabama Department of Human Resources.

44.   Employee mental health workers for MCSC violated clearly established rules and regulations promulgated by ADMH for the care and treatment of recipient residents such as Hammonds.

45.   The staff at MCSC also violated its own policies and procedures for the care and treatment of Hammonds.

46.   MCSC employees failed to follow its own policies and procedures and ADMH policies, rules and/or regulations that prohibit abuse, neglect, mistreatment, or exploitation, rules that require violations be reported to DHR, and rules requiring a safe and humane environment for recipient patients such as Hammonds.

47.   The staff of MCSC was likewise negligent and/or wanton in failing to protect Hammonds from abuse, neglect, mistreatment and exploitation, regardless of the applicability of any ADMH policy, rule or regulation.

48.   MCSC staff were negligent and/or wanton in their abuse, mistreatment, neglect, and/or exploitation of Hammonds, including but not limited to the following:

   a.   He was neglected by staff;

   b.   He was verbally abused by staff;

   c.   Staff was not properly trained;

   d.   The facility was not properly staffed;

   e.   He was exposed to unsafe conditions;

   f.   He was mistreated by staff;

   g.   His personal items were stolen;

   h.   He did not receive his monthly allotment of federal funds;

   i.   He was not turned every two hours to prevent decubitus ulcers;

   j.   He was not properly fed and suffered from mild malnutrition;

   k.   He was not given sleeping medications by 8:00 p.m. as ordered, which prevented him from appearing on time for the first period of public school and he would often

arrived at 9:00 a.m. instead of 7:30 a.m.;

l.     He was not cathed before attending school, meaning that the school nurse would have to cath him upon arrival, which would cause him to miss the morning periods of the school day;

m.    Staff was not trained in the operation of Hammonds' chair or in the proper transfer of Hammond;

n.    Staff ignored Hammonds;

o.    When staff was not ignoring Hammonds, they were often verbally abusive to Hammonds and other minor children residents of the facility;

p.    Hammonds was retaliated against by facility staff when he complained about his mistreatment or neglect at the facility;

q.    Staff was antagonistic toward Hammonds;

r.    Staff did not properly apply Hammonds' left arm brace;

s.    Staff did not schedule regular therapy for Hammonds;

t.    Staff allowed a decubitis ulcer to form;

u.    Staff sent Hammonds to school with unwashed, dirty hair;

v.    Staff tormented and bullied Hammonds; and

w.    Staff subjected Hammonds to a hostile environment.

49.    As a proximate result thereof, Hammonds suffered injury and harm.

### COUNT III
### HARASSMENT - ADA AND REHAB ACT

50.    Hammonds was subjected to unlawful harassment by staff at MCSC.

51.    It is unlawful under the Rehabilitation Act to harass a disabled person. *See, e.g., Gaither v. Barron*, 924 F. Supp. 134 (M.D. Ala. 1996).

52.    "EEOC regulations to the ADA state that 'it is unlawful to coerce, intimidate, threaten, harass or interfere with any individual in the exercise or enjoyment of ... any right granted

or protected by this part.'" *Haysman v. Food Lion*, 893 F. Supp. 1092 (S. D. Ga. 1995) (citing 29 C.F.R. § 1630.12).

53.   As a proximate result, Hammonds suffered injury and harm.

## COUNT IV
## NEGLIGENT/WANTON HIRING/RETENTION/TRAINING/SUPERVISION

54.   The defendant MCSC negligently and/or wantonly hired, retained and/or supervised its staff, and failed or omitted to adequately instruct them in the proper care for a disabled resident patient.

55.   The failure to properly hire, supervise, retain, and/or train its staff was the proximate cause of the injuries suffered by Hammonds.

## COUNT V
## VIOLATION OF FAIR HOUSING ACT

56.   The Fair Housing Act prohibits discrimination or retaliation against disabled individuals. 42 U.S.C. § 3601 et seq. "Originally Title VIII of the Civil Rights Act of 1968, the Fair Housing Act prohibited discrimination in housing on the  basis of race, color, religion, national origin, and, later, gender. See Pub. L. No. 90-284, 82 Stat. 81 (1968); Pub. L. No. 93-383, 88 Stat. 729 (1974). The Fair Housing Amendments Act of 1988 amended the Fair Housing Act (as amended, the "FHA") to bar housing discrimination based on disability. See Pub. L. No. 100-430, 102 Stat. 1619 (1988) (codified at 42 U.S.C. § 3604(f))." *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1218 (11th Cir. 2016) (holding that failure to renew lease for resident whose son had Down Syndrome was violation of FHA).

57.   The MCSC facility is a residential facility and constitutes a group home. Group homes are facilities subject to FHA standards. Hammonds lived in a group home. The Eleventh Circuit holds that group homes are "dwellings" under the FHA. *See, e.g., Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1215 (11th Cir. 2008) (holding that a group home for substance abusers meets the definition of a dwelling under the FHA). "On these facts, the district court concluded that the group homes were 'dwellings' under the Fair Housing Act because 'plaintiffs' occupancy resembles that of a resident far more than that of a hotel guest.'" *Schwarz,* 544 F.3d at 1215.

58.   "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617.

59.   There is no requirement for the exhaustion of an administrative remedy under the FHA. See

42 U.S.C. § 3613(a)(2), "An aggrieved person may commence a civil action under this subsection whether or not a complaint has been filed under section 3610(a) of this title and without regard to the status of any such complaint, but if the Secretary or a State or local agency has obtained a conciliation agreement with the consent of an aggrieved person, no action may be filed under this subsection by such aggrieved person with respect to the alleged discriminatory housing practice which forms the basis for such complaint except for the purpose of enforcing the terms of such an agreement."

60.   HUD issued regulations relating to the FHA. 24 CFR § 100.400 sets forth prohibited conduct. Section 100.400(b) states, "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of that person having exercised or enjoyed, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this part." Section 100.400© includes "handicap" as a protected status under the FHA. Section 100.400 (2) provides that the statute applies to "visitors or associates" of such persons. Section 100.400 (4) prohibits "Intimidating or threatening any person because that person is engaging in activities designed to make other persons aware of, or encouraging such other persons to exercise, rights granted or protected by this part." Section 100.400(5) prohibits "[r]etaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act." Section 100.400(6) prohibits "[r]etaliating against any person because that person reported a discriminatory housing practice to a housing provider or other authority."

61.   A claim for retaliation under § 3617 is not dependent on a successful claim or other claim under the FHA. Plaintiffs are entitled to bring standalone claims for retaliation under § 3617, regardless of whether discrimination occurred. *See, e.g., Hidden Vill. LLC v. City of Lakewood, Ohio*, 734 F.3d 519, 528-29 (6th Cir. 2013) ("Section 3617 nowhere says that it comes into play only when a violation of one of these other sections has also occurred."); *Bloch v. Frischholz*, 587 F.3d 771, 781-82 (7th Cir. 2009) ("Coercion, intimidation, threats, or interference with or on account of a person's exercise of his or her §§ 3603–3606 rights can be distinct from outright violations of §§ 3603-3606."; *United States v. Koch*, 352 F. Supp. 2d 970, 978 (D. Neb. 2004) (holding that § 3617 claims may stand alone and noting that a contrary interpretation would render § 3617 redundant). As the Ninth Circuit stated in Smith v. Stechel, 510 F.2d 1162, 1164 (9th Cir. 1975):Section 3617 Hammondss not necessarily deal with a discriminatory housing practice, or with the landlord, financer or brokerage service guilty of such practice. It deals with a situation where no discriminatory housing practice may have occurred at all   because the would-be tenant  has  been discouraged from asserting his  rights, or because the rights have actually been respected by persons who suffer consequent retaliation. It also deals with situations in which the fundamental inequity of a discriminatory housing practice is compounded by coercion, intimidation, threat or interference.

62.   As a matter of law, even if a person is mistaken in their belief that they are acting to protect

fair housing rights, they are still entitled to the protection of the FHA's anti-retaliation provisions. *See Broome v. Biondi*, 17 F.Supp.2d 211, 219 (S.D.N.Y. 1997) (holding that a person claiming violation of § 3617 "did not have to establish that the conduct she opposed was in fact a violation of the Federal Fair Housing Act ..., but only that she had a good faith, reasonable belief that the underlying actions of the [defendants] violated the law." *See also, Newell v. Heritage Senior Living, LLC*, 2016 WL 427371, at *7 (E.D. Pa. Feb. 3, 2016); *Ponce v. 480 East 21st St., LLC*, 2013 WL 4543622, at *3, n.4 (E.D.N.Y. Aug. 28, 2013).

63.   This is consistent with the treatment of retaliation claims under Title VII and the ADA. *See, e.g., Crumpacker v. Kan. Dep't of Human Res.*, 338 F.3d 1163, 1171–72 (10th Cir. 2003) (plaintiffs could maintain retaliation claims based on a "reasonable good-faith belief" that the underlying conduct violated Title VII); *Selenke v. Medical Imaging of Colo.*, 248 F.3d 1249, 1264–65 (10th Cir. 2001) (holding that "a reasonable, good faith belief that the statute has been violated suffices" to support an ADA retaliation claim).

64.   Courts look to the ADA and Title VII for precedent in evaluating FHA retaliation claims. *See, e.g., Neudecker v. Boisclair Corp.*, 351 F.3d 361, 364 (8th Cir. 2003) (relying on ADA and Rehabilitation Act precedent in evaluating FHA retaliation claim); *Walker v. City of Lakewood*, 272 F.3d 1114, 1126 (9th Cir. 2001) (stating that there was "no reason" not to apply principles set forth in Title VII and First Amendment retaliation cases to FHA retaliation claims).

65.   Hammonds may establish a prima facie case of retaliation in violation of § 3617 by showing that he: (1) engaged in a protected activity, (2) suffered an adverse action, and (3) there was a causal link between the two. *See, Walker*, 272 F.3d at 1128.

66.   Hammonds clearly engaged in protective activity. He complained to staff at MCSC about the abuse, neglect, mistreatment and exploitation at the facility.

67.   MCSC discriminated against Hammonds, a disabled person by virtue of his intellectual and physical disabilities, in violation of the FHA, solely because of his disabilities. Hammonds was excluded from the benefits of the enjoyment of the group home, including food, medication, and equipment. This conduct followed in close temporal proximity to Hammonds' complaints about the abuse, neglect, mistreatment and exploitation he suffered at the MCSC group home.

68.   In *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1223 (11th Cir. 2016), the Eleventh Circuit reiterated the instructions from the United States Supreme Court requiring Courts to give the Fair Housing Act a "broad and inclusive interpretation." (quoting City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 731, 115 S. Ct. 1776, 131 L. Ed. 2d 801 (1995)).

69.   The Rehabilitation Act of 1973 provides a private cause of action prohibiting discrimination against handicapped individuals under any program or activity receiving federal financial

assistance, even private organizations. Rehab. Act 1973, § 504, as amended; 29 U.S.C.A. § 794(b)(3).

70. MCSC receives federal financial assistance, whether through Medicare and/or Medicaid, and/or other forms of federal assistance. Hammonds is a Medicaid recipient. MCSC receives funds from the federal government for Hammonds' care and treatment. His stay at MCSC's group home is funded predominantly with federal funds, including Social Security Disability benefits, as well as Medicaid health insurance benefits.

71. Hammonds suffers intellectual disabilities, including a traumatic brain injury. He has been involuntarily committed to the care and custody of the Department of Mental Health since he was a juvenile.

72. MCSC provides residential services to those disabled individuals who are in need of institutional care. MCSC is subject to the terms of §504 of the Rehabilitation Act of 1973, as amended.

73. The neglect, abuse, mistreatment and exploitation of Hammonds constitutes discrimination in violation of § 504.

74. Hammonds is entitled to all the damages for his State and federal rights pled in this Complaint including, but not limited to, damages for emotional distress.

75. The United States Supreme Court in *Schultz v. Young Men's Christian Associates of the United States*, 139 F.3d 286, 291 (1st Cir. 1998), suggested that in a suit under § 504, "damages for emotional distress [might] be justified to punish patent misbehavior or the deliberate infliction of humiliation."

76. Hammonds was subjected to a pattern and practice of neglect, abuse, mistreatment and exploitation during his residency at MCSC. Management knew or should have known of this yet did nothing to protect Hammonds. In fact, MCSC punished Hammonds by either kicking him out of the group home or acting so harshly toward him that he had no choice but to leave the facility for his own safety after he complained of and reported neglect, mistreatment, exploitation, and abuse.

77. Hammonds was subjected to neglect, humiliation, deliberate indifference, and/or mistreatment. His treatment was degrading and humiliating and created a dangerous situation for himself and other residents of the group home. The employees of MCSC assigned to protect and care for Hammonds failed in their duties by failing to protect him from abuse, neglect, exploitation, and mistreatment.

78. The conduct of the workers assigned to protect Hammonds, as well as the actions or inactions of the other named Defendants, meets any intentionality requirements of §504.

13

DOCUMENT 2

79.    The United States Supreme Court's decision in *Franklin v. Gwinnett County Public Sch.*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), now provides the dispositive analysis for determining what remedies are available under the Rehabilitation Act. In *Franklin*, the Supreme Court reaffirmed the longstanding principle that "where legal rights have been invaded, and the federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the law done." *Franklin*, 503 U.S. 60, 112 S.Ct. at 1033 (quoting *Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946)).

80.    Hammonds respectfully demands compensatory and punitive damages under all Counts but also under the FHA, as well as attorney fees under the FHA and compensatory and punitive damages under the FHA. The FHA allows for the recovery of compensatory damages, punitive damages, and attorney fees. See42 U.S.C. § 3613(c)(1)-(2).

## COUNT VI
## VIOLATION OF AMERICANS WITH DISABILITIES ACT

81.    Hammonds has intellectual disabilities, including traumatic brain injury. He is substantially limited in one or more of his major life activities and is clearly disabled within the meaning of the statute.

82.    MCSC, as a residential care facility, is a public accommodation within the meaning of Title III of the ADA, and is thus obligated to follow the requirements of the ADA prohibiting discrimination against resident patients.

83.    Under the requirements of Title III of the ADA, MCSC may not discriminate against individuals with disabilities, including Hammonds. MCSC discriminated against Hammonds based upon his disability. It neglected, abused, mistreated, and exploited him and failed to protect him from abuse and neglect. This conduct was based upon his disabled status.

84.    It is unlawful under the ADA and the Rehabilitation Act to harass a disabled person. *See, e.g., Gaither v. Barron*, 924 F. Supp. 134 (M.D. Ala. 1996).

85.    "EEOC regulations to the ADA state that 'it is unlawful to coerce, intimidate, threaten, harass or interfere with any individual in the exercise or enjoyment of ... any right granted or protected by this part.'" *Haysman v. Food Lion*, 893 F. Supp. 1092 (S. D. Ga. 1995) (citing 29 C.F.R. § 1630.12).

86.    Claims of harassment under the ADA and Rehab Act are analyzed "according to Title VII hostile work environment standards." *Haysman* at 1106.

87.    Hammonds was subjected to harassment in violation of the ADA and the Rehab Act after his legal guardian complained that Hammonds was being neglected.

14

## COUNT VII
## FELONIOUS INJURY RULE

88.   It is a felonious act to abuse a mentally ill person.

89.   Alabama Code § 38-9-7(a) states, "It shall be unlawful for any person to abuse, neglect, exploit, or emotionally abuse any protected person. For purposes of this section, residence in a nursing home, mental institution, developmental center for people with an intellectual disability, or other convalescent care facility shall be prima facie evidence that a person is a protected person. Charges of abuse, neglect, exploitation, or emotional abuse may be initiated upon complaints of private individuals, as a result of investigations by social service agencies, or on the direct initiative of law enforcement officials."

90.   Alabama Code § 38-9-7(b) states, "Any person who intentionally abuses or neglects a person in violation of this chapter shall be guilty of a Class B felony if the intentional abuse or neglect causes serious physical injury."

91.   MCSC engaged in the felonious violation of the statutes listed herein above.

92.   As a proximate result, the plaintiffs suffered injury and harm.

## COUNT VIII
## MENACING

93.   A person commits the crime of menacing if, by physical action, he intentionally places or attempts to place another person in fear of imminent serious physical injury. Ala. Code § 13A-6-23 (1975).

94.   Staff members of MCSC menaced Hammonds by their physical actions and placed him in fear of imminent serious physical injury.

95.   As a proximate result, Hammonds suffered injury and harm.

## COUNT IX
## RETALIATION UNDER FHA, REHAB ACT, AND ADA

96.   The ADA expressly prohibits retaliation by private or public entities where an individual has opposed any act or practice unlawful under the ADA. *See, e.g.*, 42 U.S.C. § 12203; 28 C.F.R. § 35.134; 28 C.F.R. § 36.206; 29 C.F.R. § 1630.12.

97.   Section 504 of the Rehabilitation Act likewise specifically prohibits retaliation. It incorporates the anti-retaliation provision of Title VI of the Civil Rights Act of 1964. The anti-retaliation provision of Title VI incorporated by section 504 states:

No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by Section 601 of [the Civil Rights] Act  or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing  under this part.

    34 C.F.R. § 100.7(e).

98.    It is a violation of Section 504 and the ADA to intimidate, threaten, coerce, or discriminate against an individual who has engaged in a protected activity. Protected activities include filing a complaint, testifying, assisting in, or participating in an investigation or hearing under Section 504 or the ADA.

99.    Judge Dubina, writing for the Eleventh Circuit, recognized the fear of retaliation that family members of the disabled have in making complaints about abuse or neglect. "Complainants, particularly staff and sometimes family members, may prefer to remain anonymous for fear of overt or subtle retaliation." *Id.* at 498. Alabama Disabilities Advocacy *Program v. J.S. Tarwater Developmental Center,* 97 F.3d 492 (11th Cir. 1996).

100.    Hammonds and his family made filed numerous complaints on behalf of Hammonds concerning allegations of neglect, mistreatment and exploitation.

101.    In retaliation for the complaints, MCSC's employees increased their abuse, neglect, mistreatment and exploitation of Hammonds.

102.    All of the elements are met in this case. (1) Hammonds is undisputedly disabled. (2) As a disabled person, Hammonds was entitled to participate in MCSC's program. (3) Hammonds was excluded and/or evicted (either directly or indirectly) from the group home because he and/or his family complained to MCSC's  management about abuse, mistreatment, neglect and exploitation that violates the ADA, § 504, anti-abuse provisions of the Alabama Department of Mental Health, and anti-retaliation provisions of the FHA. (4) It is undisputed that MCSC receives federal funding in the form of payments from Medicaid. Hammonds thus meets all the elements of a claim for intentional discrimination and retaliation.

103.    The ADA expressly prohibits retaliation by private persons or public entities where an individual has opposed any act or practice unlawful under the ADA. *See, e.g.,* 42 U.S.C. § 12203; 28 C.F.R. § 35.134; 28 C.F.R. § 36.206; 29 C.F.R. § 1630.12.

104.    The ADA's anti-retaliation provisions do not preclude a disabled child's parents from pursuing a claim on behalf of the child after adverse actions by another. *Atlanta Independent School System v. S.F. ex rel. M.F.,* 740 F.Supp.2d 1335, 1349 (N.D. Ga. 2010); *see also Ms. H. v. Montgomery County Bd. of Educ.,* 784 F.Supp.2d 1247 (M.D. Ala. 2001) (holding that a parent has a private right of action to sue on behalf of their minor child under § 504). The Court in *Ms. H* set out the elements of the § 504 claim,

"A parent has a private right of action to sue a school system for violating § 504. *See, e.g., Arline v. Sch. Bd. of Nassau Cnty.*, 772 F.2d 759, 760 n.1 (11th Cir. 1985) (citing *Jones v. Metro. Atlanta Rapid Transp. Auth.*, 681 F.2d 1376, 1377 n.1 (11th Cir. 1982)). To prevail on a § 504 claim, a plaintiff must show "(1) the plaintiff is an individual with a disability under the Rehabilitation Act; (2) the plaintiff is otherwise qualified for participation in the program; (3) the plaintiff is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of his or her disability; and (4) the relevant program or activity is receiving federal financial assistance." *See, e.g., L.M.P. ex rel. E.P. v. Sch. Bd. of Broward Cnty.*, Fla., 516 F. Supp. 2d 1294, 1301 (S.D. Fla. 2007) (citations omitted). The only element that the parties in this case dispute is the third element.

*Ms. H.*, 784 F. Supp. 2d at 1261.

105. Recognizing that individuals face liability for retaliation, Congress included in the original, and retained in the amended statute, an anti-retaliation clause which provides protection from retaliatory mistreatment, stating:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 803, 804, 805, or 806 of this title.

106. This Anti-Retaliation provision makes clear that to coerce, threaten, or intimidate a person, or to interfere with a person in his or her exercise, enjoyment, or her helping others exercise their rights— constitutes a separate, and distinct violation of the Fair Housing Act (*See Hidden Village, LLC v. City of Lakewood, Ohio* (2013) ("Section 3617 nowhere says that it comes into play only when a violation of one of these other sections has also occurred."). In other words, retaliatory conduct is unlawful in and of itself.

107. An individual has standing to sue for retaliation pursuant to § 504 of the Rehabilitation Act when he is retaliated against for advocating for the rights of the disabled, even if the advocate is not himself disabled. *Barker v. Riverside County Office of Edu.*, 584 F.3d 821 (9th Cir. 2009). Because § 504 incorporates the anti-retaliation provisions of Title VII of the Civil Rights Act of 1964, an individual cannot be intimidated, threatened, coerced, discriminated against, or retaliated against by any entity or *person* for making a complaint, or for testifying, assisting or participating in any manner in an investigation, proceeding, or hearing. The court reasoned that "Congress recognized that disabled individuals may require assistance from others to defend their rights." *Id.* at 827.

17

108. The actions of MCSC constitute clear violations of well-established anti-retaliation provisions designed for the protection of disabled persons and their advocates. Hammonds is entitled to the protections of the anti-retaliation provisions. *See, e.g., Barker v. Riverside County Office of Education*, Case No. 07-56313 (9th Cir. 2009).

109. The claim of retaliation under the ADA, Rehab Act, and FHA is brought against MCSC, a private corporation. Retaliation claims are not limited to public entities. The ADA, FHA, and Rehab Act even allow for retaliation claims against *individuals. See, e.g., Shotz v. City of Plantation*, 344 F.3d 1161, 1164 (11th Cir. 2003) (holding that retaliation against an individual advocating for a disabled person is actionable under the ADA's anti-retaliation provisions); *see also*, 42 U.S.C. § 12203 (1995). The Court in *Shotz* also held that individuals may be sued for violating the ADA's anti-retaliation provisions, including retaliation against advocates for the disabled. *Id.* at 1179-80.

110. The plaintiff made protected and immunized claims of abuse, harassment, retaliation, and exploitation based upon his disabled status. He did so by complaining verbally to management at MCSC about the abuse, mistreatment, neglect, harassment, and exploitation. His family members complained to MCSC staff and management. MCSC staff retaliated against Hammonds for these complaints and doubled down on their harassment, abuse, mistreatment, neglect and exploitation of Hammonds.

111. As a proximate result of the violation of the anti-retaliation provisions of the ADA, Rehab Act, and FHA, Hammonds suffered injury and harm.

## PROXIMATE CAUSATION

112. All injuries suffered by Hammonds, mentally and physically, were proximately caused by the misconduct, actions, and omissions of MCSC.

## REQUEST FOR RELIEF

113. For the conduct listed herein above, the Plaintiff respectfully requests the following relief:

   a. compensatory damages, punitive damages, attorney fees, costs and all other allowable recovery in such an amount as a jury or finder of fact may award against the Defendant.

   b. All other such further in any way available at law or in equity.

## JURY DEMAND

18

114.    The Plaintiff demands a trial by jury of all issues so triable in the case.

Done and submitted this 28th day of May, 2021.

                                                  /s J. Michael Comer
                                                  J. Michael Comer
                                                  Patterson Comer Law Firm
                                                  303 Main Ave., Ste. A
                                                  Northport, AL 35476
                                                  (205) 759-3939 Ph.
                                                  (205) 759-3931 Fax

### SERVICE ADDRESSES

Montgomery Children's Specialty Center, LLC
c/o Registered Agent
Corporation Service Company, Inc
641 South Lawrence Street
Montgomery, Alabama 36104

DOCUMENT 2

IN THE CIRCUIT COURT
OF MONTGOMERY COUNTY, ALABAMA

| | | |
|---|---|---|
| FRANKIE HAMMONDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: _____ |
| | ) | |
| MONTGOMERY CHILDREN'S | ) | |
| SPECIALTY CENTER, LLC, AND | ) | |
| FICTITIOUS DEFENDANTS 1 - 60, | ) | |
| DESCRIBED BELOW: | ) | |

Fictitious Defendants 1 - 10 are those persons or entities, whether singular or plural, that abused, mistreated, exploited, or neglected Frankie Hammonds while he was a minor resident patient at MCSC; Fictitious Defendants 11 - 20 are those person or entities, whether singular or plural, who were staff members of MCSC that abused, mistreated, exploited, or neglected Hammonds while he was a minor resident patient at MCSC; Fictitious Defendants 21 - 30 are those persons or entities, whether singular or plural, who retaliated against Hammonds for his complains about his mistreatment, abuse, neglect, or exploitation; Fictitious Defendants 31 - 40 are those entities that own and/or operate and/or staff the MCSC facility; Fictitious Defendants 41 - 50 are those persons, whether singular or plural, responsible for the training and/or supervision of the staff members who neglect, mistreated, abuse, or exploited Hammonds; Fictitious Defendants 51 - 60 are those persons or entities, whether singular or plural, who acted negligently, wantonly, in violation of any state law, common law, federal statutory law, or federal common law, in a manner that caused any harm to Frankie Hammonds.

| | |
|---|---|
| | ) |
| Defendants. | ) |

## DISCOVERY REQUESTS TO MCSC

## DEFINITIONS

1.   The term "you" or "your" shall mean the defendant, the defendants' attorneys, employees, agents, or representatives and all persons acting on behalf of the defendants. In the event that there is more than one defendant, the term "you" or "your" shall mean the defendants,

separately and severally, their attorneys, employees, agents, or representatives and all other persons acting on their behalf.

2.    The term "person" shall mean any individual, partnership, firm, association, corporation, or other business, governmental, educational, legal, or other entity.

3.    The term "document" shall mean any written, recorded, transcribed, punched, taped, filmed, graphically or otherwise reproduced material of any and all kinds or descriptions however produced or reproduced or any other thing upon which information can be retrieved and recorded.

4.    The term "address" shall mean the complete street, street number, city, state, post office box or route, and box address of the subject person, as that term is applied in number 2 above.

5.    The term "identify" or "identification" when used with reference to a person, shall mean to state the full name, and present or last known address of said person. When used with reference to a document, the term "identify" or "identification" shall mean to state the document's date, author or signer, the full address of the author or signer, the type of document, and all other means of designating or describing said document, including but not limited to, the present or last known location or custodian; if any document was but is no longer in your possession, custody or control, state the disposition of said document and the reason for said disposition.

## REQUESTS FOR ADMISSIONS

1.    Admit that MCSC received federal financial funds in 2014, 2015, 2016, 2017, 2018, 2019, 2020, and 2021.

2.    Admit that MCSC, Inc. received federal financial funds from Medicare in 2014, 2015, 2016,

2017, 2018, 2019, 2020, and 2021.

3.  Admit that MCSC received federal financial funds from Medicaid in 2014, 2015, 2016, 2017, 2018, 2019, 2020, and 2021.

4.  Admit that MCSC received federal financial funds from Social Security in 2014, 20156, 2016, 2017, 2018, 2019, 2020, and 2021.

5.  Admit that MCSC. received federal financial funds on behalf of Frankie Hammonds during his residency at MCSC.

6.  Admit that Frankie Hammonds was a disabled resident of MCSC.

7.  Admit that, at all times while a resident of MCSC, Frankie Hammonds suffered from traumatic brain injury and paraplegia.

8.  Admit that Frankie Hammonds was an involuntarily civilly committed resident of MCSC.

9.  Admit that MCSC evicted Frankie Hammonds from MCSC.

10.  Admit that MCSC received complaints from staff at MCSC about the abuse, neglect, mistreatment by MCSC staff of Frankie Hammonds while he was a resident at MCSC.

11.  Admit that MCSC received complaints from Frankie Hammonds's advocate(s) about the abuse, neglect, mistreatment by MCSC staff of Frankie Hammonds while he was a resident at MCSC.

12.  Admit that MCSC had a policy and procedure, from at least 2014 to the present date, that prohibited employees, from abusing, mistreating, neglecting or exploiting patients at MCSC.

13.  Admit that MCSC had policies and procedures in effect from at least 2014 to the present date that required employees to report witnessed or suspected abuse or neglect of a resident at MCSC.

14.     Admit that patient abuse, neglect, mistreatment or exploitation is a violation of the policies
        and procedures of the Alabama Department of Mental Health and that these policies and
        procedures applied to MCSC at all times while Frankie Hammonds was a resident of
        MCSC..

15.     Admit that MCSC knew that Frankie Hammonds suffered from traumatic brain injury and
        paraplegia while he was a resident at MCSC.

16.     Admit that the abuse, mistreatment, exploitation or neglect of a resident of MCSC, such as
        Frankie Hammonds, by a staff member of MCSC, constitutes a violation of Alabama
        Department of Mental Health policies and/or procedures.

**INTERROGATORIES**

1.      Has the defendant been properly designated as a party defendant insofar as the legal
        designation of his name is concerned?  If not, please state how this defendant is to be
        properly designated as a party defendant in an action of law.

2.      Please state whether or not you expect to call any expert witnesses in the defense of this case
        and, if so, please state the name and address of said expert witness; qualifications of said
        expert witness; the opinions expected to be elicited from said expert witness and the facts
        upon which said expert will rely upon in forming said opinions.

3.      Are you aware that answers to these interrogatories are made under oath as if you were
        before a jury and may be used as evidence in the trial of this case?

4.      Identify each person(s) with discoverable knowledge about the underlying facts pertaining
        to this litigation.

5.      Do you receive funding for patient residents of MCSC from Medicare, Medicaid, Social

Security, or any other federal financial aid? If so, identify each federal agency from whom you receive funds and state whether you received federal financial assistance in 2014, 2015, 2016, 2017, 2018, 2019, 2020.

6.   State your understanding of the interval of time before Frankie Hammonds was to be rolled to prevent ulcers from forming. State whether you performed such treatment at the required intervals and identify any and all documents that support your claim that you properly rolled Frankie Hammonds at required intervals.

7.   State the date when Frankie Hammonds was admitted to MCSC, the date he was transported to any hospitals from MCSC, the date he was permanently discharged from MCSC, and whether and when he developed a decubitus ulcer while in the care and custody of MCSC.

8.   Identify by name and address each staff member of MCSC responsible for the care and/or supervision of Frankie Hammonds while he was a resident of MCSC.

9.   Identify and produce each and every policy and procedure of MCSC relating to abuse, mistreatment, neglect, and/or exploitation of MCSC residents for the period of time applicable to Frankie Hammonds's residency at MCSC.

10.   Do you deny that the Alabama Department of Mental Health has oversight authority of MCSC? If you deny this, state whether any state or federal agency has oversight over MCSC and identify the federal or state agencies with such oversight.

## REQUESTS FOR PRODUCTION

1.   Produce color copies of any and all photographs that were taken of the injuries to Frankie Hammonds  relating to any incident and/or injury he suffered while a resident of MCSC.

2.   Produce the Personnel Files, applications, and any and all other documentation, for any

24

MCSC staff member, owner, supervisor, and/or manager, that allegedly or actually abused, neglected, mistreated, and/or exploited Frankie Hammonds while he was a resident of MCSC.

3.   Produce the personnel files of all employees at MCSC who were accused or suspected or reported for violating Policy 19-10, Policy 70-5, Policy 20-36, and/ Policy 19-25 in relation to any claims of abuse, neglect, mistreatment and/or exploitation relating to resident Frankie Hammonds while he resided at MCSC.

4.   Produce any and all documentation relating to allegations of abuse and/or neglect by staff members of MCSC charged with caring for and/or supervising and/or monitoring resident Frankie Hammonds while he was a resident of MCSC.

5.   Produce any and all documentation relating to allegations of abuse and/or neglect of Frankie Hammonds to any staff, owner, supervisor, and/or manager of MCSC.

6.   Produce any and all documentation, including but not limited to, skin assessments, accountability sheets, nursing shift logs, client checklists, accountability checklists, C.C. Reports, incident reports, investigative reports, accountability sheets, interdisciplinary notes, supervisor shift-to-shift logs, supervisor notes, nursing logs, photos, and/or videos for the following dates for any and all staff or employees, nurses, supervisors, and/or independent contractors who were responsible for caring for and/or supervising Frankie Hammonds and/or any such documentation relating to Frankie Hammonds while he resided at MCSC.

7.   Produce any and all "written policies and procedures that prohibit abuse, exploitation, or neglect of consumers in programs operated by" MCSC.  See, e.g., Ala. Code § 22-56-7

25

(1975).[3]

8.    Produce any and all policy and procedure manuals or documentation of MCSC relating to
the requirement to turn paraplegic patients at regular intervals to prevent bedsores or
decubitus ulcers from 2015 to the present.

9.    Produce all policies or procedures from MCSC requiring MCSC staff to report incidents of
suspected or actual abuse, mistreatment, neglect, and/or exploitation to the Alabama
Department of Human Resources.

10.   Produce the complete file for Frankie Hammonds kept and/or maintained by MCSC.

11.   Produce all skin assessments for Frankie Hammonds relating to his residency at MCSC.

12.   Produce all documents sent to the Alabama Department of Human Resources relating to
injuries suffered by Frankie Hammonds during his residency at MCSC.

13.   Produce the complete medical records and/or records for Frankie Hammonds kept by MCSC,
including MCSC records, Department of Human Resources Records, and/or Department of
Mental Health records.

14.   Produce the complete financial file for resident Frankie Hammonds, including any
documents relating to the source of any federal financial assistance provided on behalf of
Frankie Hammonds to MCSC.

15.   Produce any and all medical records for Frankie Hammonds, including but not limited to any
notes reflecting the intervals and dates when Frankie Hammonds was rolled.

16.   Produce any and all photographs, whether depicting any injuries suffered by Frankie

---

[3] Ala. Code § 22-56-7 (2006) requires all that providers of mental health services in Alabama
"shall develop and implement written policies and procedures that prohibit abuse, exploitation,
or neglect of consumers in programs operated by the providers."

DOCUMENT 2

Hammonds while residing at MCSC, or any other photos of Frankie Hammonds while he was a resident of MCSC.

17. Produce any and all rules, regulations, policies, procedures relating in any way to the operation of MCSC's facility and the proper care and treatment of disabled residents of MCSC, from 2015 to the present.

18. Produce any and all agreements, contracts, and/or documentation between MCSC and DHR and/or Alabama Department of Mental Health and/or any 310 Board, allowing MCSC to operate facilities for the mentally disabled or physically disabled in Alabama.

19. Produce any and all documents showing the authority of MCSC to act as a facility for mentally disabled or physically disabled individuals in the state of Alabama.

20. Produce the business licenses of MCSC for 2015 - 2021.

Done and submitted this 28th day of May, 2021.

/s/J. Michael Comer
J. Michael Comer
Patterson Comer Law Firm
303 Main Ave., Ste. A
Northport, Alabama 35476

**TO BE SERVED WITH SUMMONS AND COMPLAINT**